UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TALENT TREE, INC., Plaintiff, | § § § § | |
| v. | § § | Case No. 4:07-cv-03735 |
| DONNA MADLOCK, Defendant. | § § § § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion to Dismiss, Docket No. 6. Because the Court finds that it may exercise personal jurisdiction over Defendant, and because the Court believes that venue is proper in the Southern District of Texas, Defendant's Motion is hereby **DENIED IN PART.** The Court requires further briefing to determine whether it should exercise jurisdiction over this claim under the Declaratory Judgment Act, however. Parties will have until Wednesday, April 16, 2008 to provide further briefing regarding which state's law applies to the causes of action at issue in this lawsuit.

Also pending before the Court is Plaintiff's Motion for Summary Judgment, Docket No. 11. Given that no discovery has taken place, the Court agrees that Plaintiff's Motion appears premature. The Court further instructs the parties to identify, by April 16, 2008, any issues raised in the Motion for Summary Judgment that properly can be resolved by the Court without discovery.

### I. BACKGROUND

#### A. Procedural History

Plaintiff, Talent Tree, Inc. (Talent Tree), is a Delaware corporation with its principal place of business and headquarters in Houston, Texas. Defendant, Ms. Donna Madlock, is a former Talent Tree employee and a resident of Georgia.

1

In October 2007, Ms. Madlock sent a demand letter to Talent Tree claiming unpaid bonus money allegedly due for Defendant's 2005-2006, 2006-2007, and 2007-2008 plan years. In the letter, sent by her present attorney, Ms. Madlock also asserted allegations of fraud and breach of the bonus contract.

On November 5, 2007, Talent Tree filed this lawsuit seeking a declaratory judgment pursuant to Federal Rule of Civil Procedure 47 and 28 U.S.C. §§ 2201, 2202. Talent Tree asks the Court to declare that there is no contractual relationship between Talent Tree and Ms. Madlock and, as a result, Talent Tree is not obliged to pay additional bonus money to Ms. Madlock. In the alternative, Talent Tree asks the Court to find that even if a contractual relationship existed, Talent Tree still owes no money to Ms. Madlock because of a final and binding determination by Plaintiff's Compensation Committee that no bonus payments were due. From the face of the Complaint, it does not appear that Talent Tree seeks declaratory relief related to Ms. Madlock's claims of fraud.

On March 31, 2008, Defendant filed a complaint in the Circuit Court of Tuscaloosa County, Alabama against Talent Tree and others alleging claims of fraud, promissory fraud, conspiracy to defraud, breach of contract, and breach of implied-in-fact contract, all arising out of the same facts that underlie the present declaratory judgment action.

### B. Factual Background

Ms. Madlock was hired by Talent Tree in August 2002 as a District Manager, and was promoted to Vice President of Sales and Enterprise Training on July 1, 2003. (Harris Aff. 1.) Ms. Madlock was laid off in February 2004. In March 2004, after a new group of investors purchased Talent Tree, Ms. Madlock was re-hired as an area vice president. (Madlock Aff. ¶2.) On December 1, 2004, Ms. Madlock was promoted to the position of Southeast Regional Vice President by

2

Brenda Harris.[1]  (Harris Aff. 1.)  Ms. Harris had previously served as the Southeast Regional Vice President, but was then named President and CEO of Talent Tree.  (Madlock Aff. ¶3.)  Ms. Madlock maintains that she was told that the new position "provided significant opportunities for bonus compensation calculated on the earnings ['EBITDA'] of the Southeast Region" through the company's Variable Compensation for Regional Vice Presidents plan ("RVP incentive compensation plan").  (Madlock Aff. ¶ 3).  She initially reported to Ms. Harris and later began reporting to Michael Manser, both of whom worked at the corporate office in Houston, Texas. (Harris Aff. 1-2.)

The current dispute centers on whether Ms. Madlock should have been paid incentive or bonus compensation for accounts at the Mercedes-Benz manufacturing plant in Vance, Alabama.  According to Plaintiff, The Hestair Group, LLC, a wholly owned subsidiary of Talent Tree, handles half of the Mercedes account.  (Harris Aff. 2; Manser Aff. 3.)  Under the Hestair program, employees are hired on a semi-permanent basis, or what Plaintiff refers to as a "try before you buy" arrangement.  (Harris Aff. 2, Manser Aff. 3.)  According to Plaintiff, Ms. Harris (presumably as Southeast Regional Vice President) solicited and sold the Mercedes account.  (Harris Aff. 2.)  Susan Morris handles the Hestair program for Mercedes, and reports directly to Talent Tree President Ms. Harris, not to Ms. Madlock.  (Harris Aff. 2, Manser Aff. 3.)  Plaintiff emphasizes that Ms. Madlock never met the Mercedes clients, never went on site, and did not handle the Hestair programs or the Hestair employees.  (Manser 4; *see also* Harris Aff. 3.)  There is a second part of the Mercedes account, however, involving "traditional services such as temporary staffing," which is handled directly through Talent Tree and not The Hestair Group.  (Manser Aff. 4.)  Temporaries are provided, for example, by the Birmingham and Tuscaloosa branches of Talent Tree, which were supervised by Ms. Madlock.

---

[1] In both positions, Ms. Madlock worked out of the company's Atlanta, Georgia office.

Ms. Madlock maintains that Ms. Harris told her that her incentive compensation as Southeast Regional Vice President would be calculated based on the accounts in her region, which included the Mercedes-Benz accounts in Alabama. (Madlock Aff. ¶ 3; Complaint at ¶ 15, Madlock v. Harris et al., 63-cv-2008-900183.00.) Plaintiff admits that Ms. Madlock was entitled to receive incentive compensation for the temporary staffing services program at the Mercedes plant, but not for the Hestair program. (Harris Aff. 2.) Ms. Harris also insists that she told Ms. Madlock that she would not be paid incentive compensation for the Hestair program.[2] (Harris Aff. 2.) Plaintiff admits that the Mercedes-Benz plant was physically located within Ms. Madlock's geographical region, (Harris Aff. 3), but contends that the Hestair program was not in Ms. Madlock's "scope of control," as allegedly required by the RVP incentive compensation plan, (Harris Aff. 3, Manser Aff. 4). Ms. Madlock was paid bonus compensation for the Hestair program for the 2004-2005 plan year, but Plaintiff claims that this payment was the result of an accounting error. (Harris Aff. 3.) In March 2006, Ms. Madlock sent an email to Ms. Harris and Mr. Manser with an attached letter to the Talent Tree Compensation Committee asking for special dispensation to receive incentive compensation for the Hestair program at the Mercedes plant. (Pl.'s Ex. 4.) Plaintiff claims that Mr. Manser and Ms. Harris then had a conference call with Ms. Madlock, again explaining why she should not be paid a bonus for the Hestair program.[3] (Harris Aff. 3.)

Ms. Madlock subsequently accepted her May 2006 and June 2007 bonus, which excluded the Hestair program. According to Plaintiff, Ms. Madlock did not file claims for underpayment with the Talent Tree Compensation Committee within ten days of receiving those bonuses, as

---

[2] It is not clear from the affidavit when Ms. Harris allegedly provided Ms Madlock with this information.
[3] Ms. Madlock claims that she never participated in a conference call with Mr. Manser and Ms. Harris in which they explained their reasons for excluding the Mercedes Hestair program from the calculation of her bonus. (Def.'s Resp. to Pl.'s Mot. Summ. J., Madlock Aff. ¶ 4.) This affidavit was not attached to Defendant's pending Motion to Dismiss. Defendant's response to Plaintiff's Motion for Summary Judgment does address jurisdictional issues, and might be considered a reply to Plaintiff's response to the pending Motion. The Court will consider this affidavit in an attempt to fully understand and consider all of the arguments relevant to the pending motion, but notes that its decision does not turn on the representations in this document.

4

required by the plan. (*See, e.g.*, Pl.'s Ex. 1, Variable Compensation for Regional Vice Presidents, Effective July 4, 2005 at 3.) Ms. Madlock presented her demand for unpaid incentive compensation after being terminated in September 2007. The Compensation Committee subsequently decided to treat Ms. Madlock's March 2006 email and letter as an appeal, and determined that Ms. Madlock was not entitled to any additional bonus payments.

## II. ANALYSIS

Ms. Madlock argues, first, that Talent Tree's complaint should be dismissed because the Court lacks personal jurisdiction over her. Ms. Madlock maintains, second, that venue is improper in the Southern District of Texas. Finally, Ms. Madlock contends that the Court should decline to exercise jurisdiction over this dispute under the Declaratory Judgment Act. The Court will discuss each of Ms. Madlock's arguments in turn.

### A.    Personal Jurisdiction

#### 1.    Standard

In a diversity case,[4] the Court may exercise personal jurisdiction over a nonresident defendant if the forum state's long-arm statute creates personal jurisdiction over the defendant and if the exercise of that jurisdiction "is consistent with the due process guarantees of the United States Constitution." *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). Because the Texas Long Arm Statute is coextensive with the limitations of due process, questions of personal jurisdiction in Texas are generally analyzed entirely within the framework of constitutional due process. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003). The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a nonresident defendant when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum

---

[4] There is no dispute that parties are completely diverse and that that the matter in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).

5

state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The minimum contacts requirement can be met through contacts sufficient to confer either specific or general jurisdiction. *Central Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003). To make a prima facie showing of general jurisdiction, a plaintiff must produce evidence affirmatively demonstrating that the defendant's contacts with the forum state are substantial, continuous, and systematic. *Central Freight*, 322 F.3d at 381; *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 217 (5th Cir. 2000). This test is difficult to meet because it requires a showing of extensive contacts between the defendant and the forum state. *Submersible Sys., Inc. v. Perforadora Central, S.A. de C. V.*, 249 F.3d 413, 419 (5th Cir. 2001). When the plaintiff demonstrates that a nonresident has "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities," the defendant's contacts are sufficient to support specific jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *see also Revell*, 317 F.3d at 470.

Furthermore, where jurisdiction is alleged to rest upon a nonresident defendant's contract with a resident of the forum state, the court should evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in determining whether the defendant has purposefully availed itself of the privilege of conducting business in the forum state. *Burger King*, 471 U.S. at 479; *see also Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985). In cases involving interstate contractual obligations, parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of

another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (citing *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950)).

"When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 753 (5th Cir. 1996). If a plaintiff establishes minimum contacts between the defendant and the forum state, then the defendant has the burden of proving that the assertion of jurisdiction is unfair and unreasonable. *Central Freight*, 322 F.3d at 384. Because the Court is ruling on this motion without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of plaintiff any factual conflicts posed by the affidavits.[5] *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (adding that "in a no-hearing situation, a plaintiff satisfies his burden by presenting a prima facie case for personal jurisdiction.").

### 2. Specific Jurisdiction

The Court finds that Ms. Madlock's contacts with Texas justify the exercise of specific jurisdiction in this case.

Talent Tree argues that the Court may exercise specific jurisdiction over Ms. Madlock based on the following contacts. First, Ms. Madlock participated in meetings in Houston at which the Regional Vice Presidents' incentive compensation plan was revised, reviewed and discussed. Second, Ms. Madlock sent an email to Ms. Harris and Mr. Manser, who were located in Houston, asking them to pay her incentive compensation for the Hestair program and later mailed a demand

---

[5] The Court recognizes that there are some factual disputes between the parties. The Court's finding regarding jurisdiction does not turn entirely on a resolution of those disputes, however, and the Court therefore declines to conduct an evidentiary hearing.

letter to Talent Tree in Houston. Finally, Plaintiff contends that the negotiations, contemplated future consequences, and terms and course of dealing surrounding the incentive compensation agreement support the exercise of specific jurisdiction. In addition, the Court notes that Ms. Madlock was supervised by and reported to Houston employees.

The location of the "negotiations" of the incentive compensation plan are not entirely clear. Ms. Madlock maintains that she was not actually involved in negotiating the terms of the RVP compensation plan at all, and instead simply signed and faxed back an acknowledgement of the documents describing the EBITDA bonus plan.[6] (Madlock Aff. ¶ 3.) Talent Tree contends, on the other hand, that Ms. Madlock's participation in certain meetings in Houston constituted "substantial involvement" in the creation of the plan. (Harris Aff. 4; *see also* Manser Aff. 3.) Ms. Madlock attended two meetings in Houston at which the RVP compensation plan was discussed. On May 15-16, 2005, Ms. Madlock and other RVP's attended a meeting in Houston to discuss proposed changes to all of the company's compensation plans. (Manser Aff. 2; Harris Aff. 4.) According to Talent Tree, the "major point of discussion" was the RVP incentive compensation plan. (Manser Aff. at 2.) Talent Tree also claims that Ms. Madlock was involved in the discussions regarding the RVP incentive compensation plan and made comments during the meeting. (*Id.* at 3-4.) Plaintiff additionally notes that Mr. Manser discussed the notion of "incentives based on performance at the individual's scope of control" at the May 2005 meeting in a presentation that Ms. Madlock attended. (*Id.* at 4.) From March 21-23, 2006, Ms. Madlock also attended an "executive summit" in Houston. According to Plaintiff, proposed changes to the compensation plans for 2006-2007 were discussed, and Ms. Madlock again offered feedback. (Manser Aff. 7.) Ms. Madlock insists, however, that she never had the "opportunity to negotiate or provide input into the new Talent Tree's incentive compensation plan for RVPs" at any meeting. (Def.'s Resp. to Pl.'s Mot. Summ.

---

[6] Ms. Madlock emphasizes that she did not sign the acknowledgement in Texas, though she did fax it to Houston. (*Id.*)

J., Madlock Aff. ¶ 4.) Plaintiff does not allege that Ms. Madlock's own incentive compensation, the Mercedes-Benz account, or the Hestair program were discussed at these meetings. Even resolving factual disputes in favor of jurisdiction, the Court does not believe that Ms. Madlock's participation in these meetings is necessarily dispositive as to the location of the agreement's "negotiation."

Although the RVP incentive compensation agreement—which cannot be considered in isolation from Ms. Madlock's overall conditions of employment—clearly had contemplated consequences in Georgia and the Southeast region, where Ms. Madlock carried out her work, the agreement also had anticipated consequences in Houston. The company supervised Ms. Madlock's work and budget and made decisions regarding the incentive compensation plan in Houston. The Compensation Committee reviewed claims regarding employee disputes over bonus payments in Houston. Furthermore, Ms. Madlock's participation in meetings in Houston regarding the RVP compensation plan and in at least three other meetings in Houston related to her employment, (*see* Manser Aff. 7; Harris Aff. 1), are further evidence of contemplated consequences in the forum state.

Finally, Ms. Madlock sought to invoke the terms of the RVP incentive compensation plan by sending an email to Ms. Harris and Mr. Manser in Houston. In the email, Ms. Madlock asked Ms. Harris and Mr. Manser to consider and discuss her letter asking the Compensation Committee to include the entire Mercedes-Benz account when calculating her incentive compensation. Her attorney also sent a demand letter regarding the incentive compensation to Talent Tree in Houston.

This case is not, as Plaintiff claims, perfectly analogous to *Central Freight*, 322 F.3d at 382 (upholding specific jurisdiction over a commercial defendant that "reached out to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation" and knowingly caused business activity in Texas), or *Polythane Systems, Inc. v. Marina Ventures Intern., Ltd.*, 993 F.2d 1201, 1205 (5th Cir.

1993) (upholding the exercise of specific jurisdiction in a case in which the performance of a contract was to take place entirely in the forum state). Ms. Madlock did, however, enter into an ongoing business relationship with a company whose headquarters were located in Texas and made "multiple trips and phone calls to Texas in furtherance of that relationship." *Latshaw v. Johnston*, 167 F.3d 208, 212 (5th Cir. 1999). Ms. Madlock's contacts with Texas do not appear to be random, fortuitous, or attenuated. *See, e.g., Burger King*, 471 U.S. at 475. The Court believes that Ms. Madlock, through her employment and RVP incentive compensation agreement, contemplated "continuing obligations and wide-reaching contacts" with Texas. *See Stuart v. Spademan*, 772 F.2d 1185, 1194 (5th Cir. 1985). The existing cause of action arises out of or is at least related to these contacts. The Court finds, therefore, that Ms. Madlock could "reasonably anticipate being haled into court" in Texas as a result of these contacts. *Burger King*, 471 U.S. at 473 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The exercise of jurisdiction in this case does not offend traditional notions of fair play and substantial justice. In making such a determination, a court must balance:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Central Freight*, 322 F.3d at 384 (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 115 (1987)). The burden is on the defendant to make a "compelling case" that jurisdiction is unreasonable. *Id.* (citing *Burger King*, 471 U.S. at 477). The burden of requiring Ms. Madlock to litigate in Texas appears to be no greater than the burden of requiring Talent Tree to litigate in Alabama. Although Atlanta—where Ms. Madlock resides and her attorney is located—is admittedly closer to Tuscaloosa, Alabama than to Houston, Ms. Madlock would still be

10

required to travel to litigate in that forum. Furthermore, even though it is plausible that there might be some witnesses located in Alabama, the primary witnesses in this case appear to be the parties themselves. Finally, given modern communications, many interactions with the Court, including hearings, can be conducted electronically or by telephone. Texas has some interest in determining a compensation dispute between a corporate resident and its employee. Given that two similar lawsuits are pending in different fora, the interstate judicial system's interest in obtaining the most efficient resolution of controversies is implicated. Plaintiff's Alabama state court action was filed less than two weeks ago, however, and over five months after the instant lawsuit was filed. The Court does not believe, therefore, that concerns for efficiency render the exercise of jurisdiction in this case "unconstitutionally offensive to traditional notions of fair play and substantial justice."[7] *Central Freight*, 322 F.3d at 384. Finally, there is no indication that the interest of the states in furthering substantive social policies is implicated in this lawsuit. Defendant has not, therefore, made a compelling case that the Court's exercise of personal jurisdiction over Ms. Madlock offends traditional notions of fair play and substantial justice.

### 3.    General Jurisdiction

Plaintiff argues that Ms. Madlock's contacts with Texas are substantial, continuous, and systematic, and therefore justify the Court's exercise of general jurisdiction. Because the Court finds that it has specific jurisdiction over Ms. Madlock, it need not reach this question. The Court does note, however, that, after reviewing the extent of Ms. Madlock's contacts with Texas, these contacts, even examined in toto, do not appear to be as extensive as those that the Supreme Court and Fifth Circuit have found sufficient to support the exercise of general jurisdiction. *See, e.g.,*

---

[7] The Court will further consider the relevance of the Alabama state lawsuit, however, when discussing its discretionary jurisdiction under the Declaratory Judgment Act.

11

*Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir. 1986) or *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952).

**B.    Venue**

Ms. Madlock claims the Southern District of Texas is not the proper venue to consider this declaratory judgment action under 28 U.S.C. § 1391 (a) because "the property, events or omissions" giving rise to this claim occurred either in Georgia or in Alabama.[8] Talent Tree, on the other hand, argues that venue is proper because "a substantial part of the events or omissions giving rise to the claim" occurred in Texas. 28 U.S.C. § 1391 (a)(2). As explained in its jurisdiction analysis, it appears that a substantial part of the events or omissions giving rise to this claim did, in fact, occur in Houston, Texas. Talent Tree developed and construed the RVP incentive in Houston, made representations to Ms. Madlock regarding that plan from Houston, supervised Ms. Madlock's work from Houston, discussed and refused her request for additional incentive compensation from Houston. The Compensation Committee met to decide Ms. Madlock's dispute over her bonus payments in Houston. Although the question of whether the Hestair program was in Ms. Madlock's scope of control and whether she should have received incentive payments for the entire Mercedes-Benz account may also implicate matters that occurred in Alabama and Georgia, this does not change the fact that a substantial part of the events or omissions giving rise to the claim also occurred in Houston. The Court therefore finds that venue is proper in the Southern District of Texas.

**C.    Exercise of Declaratory Judgment Jurisdiction**

Ms. Madlock argues that the Court should decline to exercise its discretionary jurisdiction over this declaratory judgment action.

---

[8] Ms. Madlock has not asked the Court to transfer the case to either of these districts under 28 U.S.C. § 1404(a). In fact, Ms. Madlock strongly argues that the Court should allow Ms. Madlock's own action to proceed in an Alabama *state* court.

12

A district court "possesses discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). When considering whether to dismiss a declaratory judgment suit, the Court must determine: "(1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387 (5th Cir. 2003). The first two factors do not appear to be in dispute in this case. There clearly is an actual controversy and, although Ms. Madlock has filed a cause of action in state court, she did not do so before this action was filed. *See Sherwin-Williams*, 343 F.3d at 388 n. 1.

The Court decides whether to exercise its discretion to decide or dismiss the action by weighing seven nonexclusive factors set forth in *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585 (5th Cir. 1994).[9] These factors are:

> (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated;
> (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;
> (3) whether the plaintiff engaged in forum shopping in bringing the suit;
> (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;
> (5) whether the federal court is a convenient forum for the parties and witnesses;
> (6) whether retaining the lawsuit would serve the purposes of judicial economy; and
> (7) whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Sherwin-Williams*, 343 F.3d at 388 (citing *Trejo*, 39 F.3d at 590-91).

---

[9] In *Sherwin-Williams*, the Fifth Circuit noted that the *Trejo* factors address the same three categories of issues that other circuits use to determine whether a court should accept or decline jurisdiction in a declaratory judgment action. 343 F.3d at 391. Those factors are: 1) the proper allocation of decision-making between state and federal courts; 2) fairness, including considerations of forum shopping and anticipatory filing; and 3) efficiency and the need to avoid duplicative or piecemeal litigation. *Id.*

In order properly to weigh these factors, it is important for the Court to know what law will apply to the pending claims. For example, in *Sherwin-Williams*, the Fifth Circuit noted that every circuit's test "emphasizes that if the federal declaratory judgment action raises only issues of state law and a state case involving the same state law issues is pending, generally the state court should decide the case and the federal court should exercise its discretion to dismiss the federal suit." 343 F.3d at 391-92. Presumably this consideration applies when the state court is interpreting its *own* state law.

In its pending Motion for Summary Judgment, Talent Tree presumed Texas law would apply to its claims. In her response to the motion, Ms. Madlock argues that Alabama law, not Texas law, should apply to the claims. In order to properly determine whether it should exercise its Declaratory Judgment Act jurisdiction over this suit, the Court requires further briefing on this matter. Parties shall therefore have until Wednesday, April 16, 2008 to brief the Court on which state's law should apply to the claims at issue in this lawsuit.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Court agrees with Defendant that Plaintiff's Motion for Summary Judgment appears to be premature, given that no discovery has been conducted in this case. The Court is therefore inclined to grant Defendant's request for a continuance. *See* FED. R. CIV. P. 56(f); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (noting that a "continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course"). The Court requests that the parties identify, however, by April 16, 2008, any issues raised in the Motion for Summary Judgment that properly can be resolved by the Court without the aid of discovery.

## IV. CONCLUSION

The Court finds that it has personal jurisdiction over Ms. Madlock. Defendant's Motion to Dismiss is therefore **DENIED IN PART**. Parties will have until April 16, 2008 to further brief the Court on which state's law applies to the pending causes of action and to identify which issues raised in Plaintiff's Motion for Summary Judgment, if any, may be decided by the Court without the need for discovery.

**IT IS SO ORDERED.**

**SIGNED** this 8the day of April, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE