UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TALENT TREE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:07-cv-03735 |
| | § | |
| DONNA MADLOCK, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's Motion for Summary Judgment. The Court previously granted Plaintiff's request to stay discovery pending the resolution of one issue raised in the Motion: Is the Variable Compensation Plan for Regional Vice Presidents a contract? After considering the initial and supplemental briefing, arguments presented by parties at a hearing, and the relevant law, the Court finds that Plaintiff's Motion, Doc. No. 11, should be **DENIED WITHOUT PREJUDICE TO REFILING** pursuant to a new scheduling order to be entered by the parties no later than September 19, 2008.

I.  BACKGROUND

   A.  History of Employment

Ms. Madlock was first hired by Talent Tree in August 2002 as a District Manager. Ms. Madlock was laid off in February 2004. In March 2004, after a new group of investors purchased Talent Tree, Ms. Madlock was re-hired as an area vice president. Ms. Madlock's Employment Agreement states that she was hired as an at-will employee. In December 2004, Ms. Madlock was promoted to the position of Southeast Regional Vice President by Brenda

1

Harris.[1] Ms. Harris had been serving as the Southeast Regional Vice President, but was then named President and CEO of Talent Tree. Ms. Madlock maintains that she was told that the new position "provided significant opportunities for bonus compensation calculated on the earnings ['EBITDA'] of the Southeast Region" through the company's Variable Compensation for Regional Vice Presidents plan ("RVP Plan"). (Madlock Aff. ¶ 3).

The current dispute centers on whether Ms. Madlock should have been paid incentive or "bonus" compensation for accounts at the Mercedes-Benz manufacturing plant located in Vance, Alabama. Ms. Madlock maintains that Ms. Harris informed her that her incentive compensation as Southeast Regional Vice President would be calculated based on the accounts in her region, which included the Mercedes-Benz accounts in Alabama. (Madlock Aff. ¶ 3; Complaint at ¶ 15.) Talent Tree admits that Ms. Madlock was entitled to receive incentive compensation for the temporary staffing services program at the Mercedes plant, but argues that she was not entitled to incentive compensation for a separate part of the Mercedes account which is handled by Susan Morris and the "Hestair Group." (Harris Aff. 2-3; Manser Aff. 4-6.) Talent Tree admits that the Mercedes-Benz plant was physically located within Ms. Madlock's geographical region, (Harris Aff. 3), but contends that the Hestair program was not in Ms. Madlock's "scope of control," as allegedly required by the RVP incentive compensation plan, (Harris Aff. 3, Manser Aff. 6.) Ms. Madlock was paid bonus compensation for the Hestair program portion of the Mercedes account for the 2004-2005 plan year, but Talent Tree claims that this payment was the result of an accounting error. (Harris Aff. 3.) In March 2006, after she became aware that Talent Tree no longer intended to include the Hestair part of the Mercedes account in the calculation of her incentive calculation, Ms. Madlock sent an email to Ms. Harris and Mr. Manser with an attached letter to the Talent Tree Compensation Committee asking for special dispensation to receive

---

[1] In both positions, Ms. Madlock worked out of the company's Atlanta, Georgia office.

incentive compensation for the Hestair program at the Mercedes plant. (Doc. No. 11, Ex. 6.) Ms. Madlock received bonus compensation in the 2006 and 2007 plan years, but was not paid bonus compensation for the Hestair part of the Mercedes account those years.

According to Talent Tree, Ms. Madlock did not file claims for underpayment with the Talent Tree Compensation Committee within ten days of learning of the alleged disparity, as required by the plan. (*See, e.g.*, Doc. No. 11, Ex. 3, Variable Compensation for Regional Vice Presidents, Effective July 4, 2005 at 3.) Ms. Madlock presented a demand for unpaid incentive compensation after being terminated in September 2007. The Compensation Committee subsequently decided to treat Ms. Madlock's March 2006 email and letter as an appeal, and determined that Ms. Madlock was not entitled to any additional bonus payments.

### B. RVP Variable Compensation Plans

At the center of the dispute before the Court is the Talent Tree Regional Vice President Variable Compensation Plan ("RVP Plan"). Ms. Madlock signed an acknowledgment that she had received and read the RVP Plan in August 2005 and again in May 2006.

The general language of the 2005, 2006, and 2007 RVP Plans is virtually identical, although the specific framework set forth for calculating an RVP's annual bonus differs. All three RVP Plans state that "[t]he Plan does not constitute a contract of employment, and since all Talent Tree employees are employees at will, participation in this Plan does not guarantee continued employment." (Doc. No. 11, Ex. 3, 4, 5.) All three RVP Plans also state:

> Talent Tree reserves the right to amend or discontinue the plan at any time in its sole discretion and without prior notice. No such amendment or discontinuance will be applied retroactively to deprive participants of any commissions/bonuses earned and payable as of the effective date of such amendment or discontinuance, however, any right to receive commissions/bonuses or other incentive payments after that date will be determined by such amended plan, if one is adopted.

(*Id.*) The RVP Plans state that Talent Tree views the plans as "an essential element of increasing its customer base and profitability." (*Id.*) Plaintiff's witness, Michael Manser, testified by affidavit that the RVP Plans are "incentive compensation" plans and that Talent Tree "tie[s] incentive compensation to motivating employees to improve the performance of the profit and loss operations that are under or 'within the scope' of their control. In other words, they are rewarded for their efforts and successes . . . ." (Manser Aff. 1-2.)

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.  ANALYSIS

Plaintiff Talent Tree contends that the RVP Plan is not a contract and that Ms. Madlock therefore cannot succeed on any breach of contract claim against Talent Tree for failure to pay her bonus compensation in accordance with the Plan.

A.   **Choice of Law**

In its second Order on Defendant's Motion to Dismiss, Doc. No., 25, the Court stated that it would likely apply Texas law to the claims in this lawsuit. The Court now finds that Texas law does, indeed, govern Plaintiff's contract claims.

The Court applies the choice-of-law rules of Texas, the state in which the action was filed. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Texas follows the Second Restatement's "most significant relationship" test to determine choice of law over a contract claim if the contract does not include a choice of law provision. *See, e.g., Minnesota Min. and Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex. 1997). The general factors used to decide which law will apply under this test are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Torrington Co. v. Stutzman*, 46 S.W. 3d 829, 848 (Tex. 2000). In a contract case, the Court considers the following factors:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

5

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 (adding that "[t]hose contacts are to be evaluated according to their relative importance with respect to the particular issue."); *Torrington Co.*, 46 S.W. at 848; *Scottsdale Ins. Co. v. National Emergency Services, Inc.*, 175 S.W.3d 284 (Tex. App.—Houston 2004).

Based on these factors, Plaintiff Talent Tree urges the Court to apply Texas law, and Defendant Madlock insists that the Court should apply Alabama law.

It is not entirely clear from the record where or even whether the RVP Plan was "negotiated." Plaintiff insists that Ms. Madlock's participation in meetings about changes to the RVP Plan in Houston should be considered her "negotiation" of the Plan, but Ms. Madlock argues that she did not have the opportunity actually to negotiate the terms of her variable compensation. Ms. Madlock is not sure where she signed the Plan acknowledgments. In an affidavit submitted with her Motion to Dismiss, Ms. Madlock stated that to the best of her recollection, she executed the document "in Georgia or whatever southeast region Talent Tree office I was visiting at the time and faxed the form back to the new Talent Tree's central office in Houston." (Madlock Dec., Doc. No. 6, Ex. 1.) It is not clear, therefore, that she signed them in either Texas or Alabama. Ms. Madlock resided in Georgia (not Alabama), and Talent Tree is a resident of Texas. Although Texas generally applies the law of the state where a personal services contract is performed, it is not entirely clear that the RVP Plans should be considered primarily a contract for personal services. *See Descants v. Wackenhut Corp.*, 793 S.W. 2d 670, 679 (Tex. 1990) (finding that Texas law governed a contract where the "gist of the agreement . . . was the performance of personal services in Texas"). The purpose of the Plan is to motivate employees in their work. Ms. Madlock performed much of her work in her Atlanta, Georgia office. She supervised offices in Florida, Georgia, North Carolina, and Alabama. Ms. Madlock

6

claims that she should have been compensated for accounts at the Mercedes plant in Alabama, which were supported by Alabama Talent Tree offices that Ms. Madlock supervised. (Madlock Dec. 3.) Talent Tree insists, on the other hand, that Ms. Madlock has never even been to the Mercedes plant. (Harris Dec. 3.) The Plan makes quite clear, however, that it is not, itself, a contract for employment, and the primary focus of the Plan is the calculation and payment of the incentive compensation. This focus appears to be the real "gist" of the RVP Plan. Incentive compensation is calculated and paid from Texas. Any disputes over this compensation are directed to the Compensation Committee, which also meets and makes its determinations in Texas.[2]

The Court finds, therefore, that the state with the most significant relationship to the transaction and the parties is Texas, and will therefore apply Texas law.

### B. Illusory Promises and Unilateral Contracts Under Texas Law

In 1994, the Texas Supreme Court declared that "[a]t-will employees may contract with their employers on any matter except those which would limit the ability of either employer or employee to terminate the employment at will." *Light v. Cantle Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex. 1994). The court explained:

> Consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment. Such a promise would be illusory because it fails to bind the promissory who always retains the option of discontinuing employment in lieu of performance. When illusory promises are all that support a purported bilateral contract, there is no contract. In short, we hold that "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory.

*Id.* (internal citations omitted). The Court observed in a footnote that "the promise of a raise to an at-will employee, for example, would be illusory because it is dependent upon some period of

---

[2] Even if the Plan should be considered a contract for personal services, it is not clear that Alabama law would apply, given that the bulk of Ms. Madlock's services were performed in Georgia.

continued employment. Upon promising a raise in wages, the employer could fire the employee and be under no obligation to perform the promise." *Id.* at 644 n. 5. The *Light* court recognized, however, that "[i]f only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promissory who made the illusory promise can accept by performance." *Id.* at 644 n. 6. The court clarified that "[t]o form such a unilateral contract, (1) the performance must be bargained-for so that it is not rendered past consideration, and (2) acceptance must be by performance and not by a promise to perform." *Id.* (internal citations omitted). The court noted, without further explanation, that "[s]uch a unilateral contract existed between Light and United as to Light's compensation." *Id.* The Court nonetheless later observed that the "promise to pay salary and commissions" in the agreement between Light and United was illusory. *Id.* at 646 n. 9.

Over a decade later, the Texas Supreme Court re-visited footnote 6 of *Light* in *Alex Sheshunoff Management Services, L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006). The *Sheshunoff* court observed that footnote 6 was not essential to the holding in *Light*, but agreed with the court's observation that "'[i]f only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promissory who made the illusory promise can accept by performance.'"[3] *Id.* at 650, 651.

In *Vanegas v. American Energy Services*, a Texas Court of Appeals found that a promise by an employer ("AES") to pay employees 5% of the proceeds for any sale or merger if they were still employed at the time of the sale or merger was not an enforceable contract. 224

---

[3] *Sheshunoff* went on to "disagree with *Light*'s view that a unilateral contract can never meet the requirements of the [Covenants Not to Compete] Act because such a contract is not immediately enforceable when made." 209 S.W.3d at 650-51.

8

S.W.3d 544 (Tex. App.—Eastland 2007, *pet. granted*).[4] The *Vanegas* plaintiffs alleged that a valid unilateral contract existed because AES's promise "consisted an offer of an incentive bonus . . . that they accepted by performance (their continued employment until the time of the merger)." *Id.* at 548. The court found that AES's promise to pay was illusory because it depended on the plaintiffs' continued employment, and AES could have terminated the plaintiffs in lieu of performance. *Id.* at 549. The court then held, relying on language from *Light* and *Shesunoff*, that no unilateral contract was formed by the employee's performance because "a non-illusory promise is required for the formation of a binding unilateral contract." *Id.* at 550. Because AES's promise was illusory, the court concluded that it could not serve as an offer for a unilateral contract, and the plaintiffs could not make the promise enforceable by performance. *Id.*

In reaching its decision, the *Vanegas* court struggled to distinguish several Texas and Fifth Circuit cases enforcing employer promises of bonuses in at-will employment relationships. *Id.* at 552. The *Vanegas* court noted that these cases were decided prior to *Light*, and further observed that the cases did not address whether the employer's promise was illusory or whether an illusory promise could serve as an offer for a unilateral contract. *Id.* The *Vanegas* court also attempted to distinguish the cases on their facts. *Id.* at 553.

At least one other Texas Court of Appeals has also recently held, in an unreported decision, that an employer's oral promise to pay an employee a bonus was unenforceable because it was based on illusory consideration. *See Lewis v. Vitol, S.A.*, No. No. 01-05-00367-CV, 2006 WL 1767138 (Tex. App.—Houston [1 Dist.] 2006, *no pet*) (not designated for publication).

---

[4] The Texas Supreme Court has accepted a Petition for Review of *Vanegas*, but the case has not yet been set for oral argument.

Plaintiff Talent Tree urges this Court to adopt the *Vanegas* court's interpretation of *Light* and to find that the RVP Compensation Plan does not constitute a contract because both Talent Tree's promise to pay bonus compensation and Ms. Madlock's promise to work (perhaps harder than she otherwise would have worked in the absence of such a plan) are illusory. Thus, concludes Plaintiff, under *Vanegas* and *Light*, there could be no bilateral or unilateral contract, because there was no non-illusory promise that could serve as an offer that the other party could accept by performance.

Where the Texas Supreme Court has not ruled on an issue, this Court looks "to the decisions of intermediate courts of appeals for guidance" when attempting to make an "Erie guess" as to how the Supreme Court would decide the question. *Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). The Court need not rely on state appellate court decisions, however, if the state's highest court has already ruled on a matter or if "it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.*

This Court finds that the Texas Supreme Court's prior ruling regarding the enforceability of an employer's promise to pay a bonus, which was not explicitly overruled by *Light* or *Sheshunoff*, is directly on point and governs this case. Furthermore, the Court finds unpersuasive the application of *Light* by the *Vanegas'* court. Finally, the Court believes that this case is distinguishable from both *Vanegas* and *Lewis*.

In *Miller v. Riata Cadillac Co.*, the Texas Supreme Court held that "[A]n employee who is discharged without good cause prior to the time specified for payment of a bonus is entitled to recover a pro rata part of such bonus for the period he actually worked." 517 S.W.2d 773, 775 (Tex. 1975); *see also Marvin Turner Engineers v. Allen*, 326 S.W.2d 200, 203 (Tex. Civ. App. 1959) (noting that "[a] bonus is not a gift or gratuity but a sum paid for services," and upholding

a finding that an at-will employee was entitled to a pro rata share of a bonus that was promised not only in exchange for continued employment, but also "to induce the employees to produce a profit for the company by efficient and dedicated labors"). *Vanegas* sought to distinguish *Miller* because "the employment contract [at issue] provided for an annual bonus as part of the employee's compensation." 224 S.W.3d at 5553. The "contract" in *Miller*, however, was an oral, at-will agreement:

> In *Miller*, the Texas Supreme Court held that an at-will employee who was discharged without good cause prior to the time specified for payment of an annual bonus was entitled to recover the pro rata portion of the bonus attributable to the part of the bonus period he worked before his discharge. . . . *Miller* addressed a claim based solely on a contract (i.e., the oral, at-will agreement that provided for payment of such bonuses in previous years).

*Shannon v. Southern Co. Energy Marketing, L.P.*, No. 14-01-01165-CV, 2002 WL 1733243 (Tex. App.—Houston [14 Dist.] 2002) (not designated for publication).

Corbin on Contracts echoes this jurisprudence, explaining that a unilateral contract is formed where an employer promises to pay a bonus:

> The same unilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for a stated period. It is now recognized that these are not pure gratuities but compensation for services rendered. The employer's promise is not enforceable when made, but the employee can accept the offer by continuing to serve as requested, even though the employee makes no promise. There is no mutuality of obligation, but there is consideration in the form of service rendered. The employee's one consideration, rendition of services, supports all of the employer's promises, to pay the salary and to pay the bonus. Indeed, although the bonus is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract.

2-6 CORBIN ON CONTRACTS § 6.2.

Moreover, as noted above, the Court does not find *Vanegas*' interpretation of the language in *Light* persuasive, because it could lead to clearly untenable results. If a promise by

an employer to pay a bonus to an employee can never give rise to an enforceable unilateral contract, it is not at all clear why an employer's promise to pay an at-will employee a particular wage would be enforceable. Both the employer's promise to pay a particular wage and the employee's promise to work are clearly illusory under the *Vanegas* court's analysis, and thus neither promise could constitute an offer for a unilateral contract. Indeed, a recent supplement to Corbin on Contracts has criticized *Vanegas* on these precise grounds:

> The [*Vanegas*] court's analysis may attempt to prove too much. The argument that a promise to grant a raise to a terminable-at-will employee is necessarily illusory raises the question, why is an employer's original promise to pay a certain wage to an at-will employee enforceable when the employee performs? The court's analysis would suggest that the employer's promise was never enforceable. If an at-will employee is hired at a promised compensation and performs for some period, the court's analysis would suggest that the promised rate of compensation was never enforceable.

1-1 CORBIN ON CONTRACTS Supp. to § 1.17.

Whether the Texas Supreme Court would find that an employer's offer to pay bonus compensation is not illusory or would instead rule that an employer's illusory promise to pay a bonus may constitute an offer for a unilateral contract that an employee may accept by performance is unclear. Despite its explicit language that a "non-illusory" promise may serve as an offer for a unilateral contract, *Light* itself may point to the latter conclusion.[5] As explained above, *Light* noted that "a unilateral contract existed between Light and United as to Light's compensation," but later observed that the "promise to pay salary and commissions" in the agreement between Light and United was illusory. 224 S.W. 3d at 646 n. 6, 9. Whichever route

---

[5] The treatise cited in footnote 6 of *Light* did not explicitly or unequivocally state that only a "non-illusory" promise may serve as an offer for a unilateral contract. Farnsworth on Contracts explains that "Sometimes the consideration for a promise is some performance by the promisee . . . Such contracts are often called 'unilateral' contracts because a promise is made on only one side." *See Light*, 224 S.W. 3d at 646 n. 6 (citing E. ALLAN FARNSWORTH, CONTRACTS 72-82 (1982)); E. ALLAN FARNSWORTH, CONTRACTS, §2.3 (3d ed. 2004). In a section discussing illusory promises, Farnsworth goes on to explain: "Even if a promise is unenforceable because the promise given in return for it is illusory, the first promise is not necessarily without legal effect. It may amount to a disguised offer, since an offer is a kind of promise." FARNSWORTH, §2.13.

the Texas Supreme Court might take, this Court is convinced that it would reach the conclusion that a bonus compensation plan, at least under the circumstances present in this case, is enforceable as a unilateral contract.

Furthermore, this case is factually distinguishable from both *Vanegas* and *Lewis*. The RVP Incentive Compensation Plan is a written plan that contains detailed formulas for the payment of bonus compensation. The RVP Incentive Plan is therefore quite different from the entirely discretionary bonus promised to the plaintiff in *Lewis*. Talent Tree does not deny that Ms. Madlock was promised this incentive compensation when offered the position of Regional Vice President. Although the Plan states that it does not constitute a contract of *employment* it does not say that it is not itself enforceable as a promise to pay compensation. Also significant is the fact that the language of plan itself prohibits Talent Tree from amending or discontinuing the plan retroactively. Furthermore, Talent Tree has acknowledged that the purpose of the Plan is to motivate and improve the performance of Regional Vice Presidents, and presumably employees will make extra efforts to perform in response to the promise of bonus compensation.[6] The RVP bonus compensation is also therefore provided in exchange for more than mere continuance of employment, which was not the case in *Lewis* and *Vanegas*. Additionally, in this case, both Talent Tree and Ms. Madlock performed; Ms. Madlock presumably made extra efforts in her work, and Talent Tree paid Ms. Madlock the bonus compensation it believed was owed according to its interpretation of the RVP Plan language. In sum, it is not at all clear that such a written promise to pay a bonus according to a non-discretionary formula that cannot be amended or discontinued retroactively should be considered illusory, even though that promise is made to

---

[6] This fact also speaks to Plaintiff's allegation that Ms. Madlock's performance was past consideration, i.e., that she already had an obligation to work pursuant to the employment agreement, presumably in exchange for a salary.

an at-will employee. *See, e.g.,* WILLISTON ON CONTRACTS § 7:7 (defining illusory and non-illusory promises).

The Court cannot delay its decision on this matter indefinitely, awaiting the Texas Supreme Court decision in *Vanegas*. Should the Texas Supreme Court reach a different conclusion while this litigation is pending, the Court would, of course, reconsider this Order. In the meanwhile, the Court is obliged to make its best "Erie guess" as to how the Court will rule. The Court concludes that the RVP Plans at issue in this case would be an enforceable unilateral contract under Texas law.

The Court's holding does not, of course, suggest that Ms. Madlock is entitled to any monies for the Hestair portion of the Mercedes account. That is a separate decision for another day, after the parties have had the opportunity to conduct discovery.

## IV.   DISCOVERY AND SCHEDULING ORDER

In its Motion for Summary Judgment, Plaintiff argues that even if the RVP Plans can be considered a contract, Plaintiff was not entitled to receive compensation for the Hestair portion of the Mercedes account. Ms. Madlock argues that Brenda Harris promised her compensation based on Southeast Region which included the Mercedes account and that the Mercedes account should have been included in her incentive compensation under the language of the RVP Plans. Ms. Madlock insists that discovery is necessary to determine whether a fact issue exists on these matters.

After a hearing on the pending Motion for Summary Judgment, the Court stayed discovery and allowed the parties to submit additional briefing on the question of whether the RVP Plans were a contract. The Court now finds that discovery should proceed before it can resolve the remaining arguments in Plaintiff's Motion for Summary Judgment. *See* FED. R. CIV.

P. 56(f). This decision will likely require an amendment to the current Agreed Scheduling Order.

The parties should, therefore, submit a revised scheduling order to the Court no later than September 19, 2008. The Court will set a new trial date for December 7, 2009. If the parties have any questions about the new scheduling order, are unable to reach agreement on deadlines, or would like to set the new trial date for sooner than December 7, they should contact the Court's case manager.

V. CONCLUSION

Because the Court finds that the RVP Plans can be considered a contract, Plaintiff's Motion for Summary Judgment is **DISMISSED WITHOUT PREJUDICE TO REFILING**. Parties shall submit a new scheduling order no later than September 19, 2008.

**IT IS SO ORDERED**.

SIGNED this 2d day of September, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

15